UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DONALD E. BLIZZARD, JR.,
                                                :

                    Plaintiff,                            OPINION AND ORDER
                                            :             03 Civ. 10301 (GWG)

     -v.-

                                                  :

JO ANNE B. BARNHART, Commissioner of
Social Security,                               :

                    Defendant.        :
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

      Plaintiff Donald E. Blizzard brings this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner") denying his claim for disability insurance benefits and Supplemental Security

Income ("SSI"). The parties have consented to this matter being determined by a United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c). The Commissioner has moved for judgment on

the pleadings pursuant to Fed. R. Civ. P. 12(c). Blizzard opposes this motion and has cross-

moved for judgment on the pleadings. For the reasons stated below, the Commissioner's motion

is denied and Blizzard's motion is granted.

I. BACKGROUND

     A. Blizzard's Claim for Benefits and Procedural History

     Blizzard filed an application for disability insurance benefits on November 3, 1999 and a

claim for SSI benefits on April 4, 2000.  R. 15, 126-28, 139-40.[1]  Blizzard claimed that he

suffered from bilateral slipped capital femoral epiphysis complicated by chondrolysis and acute

arthritis, and alleged that pain and stiffness in his joints, hips, pelvis, and knees made it difficult

to sit or stand for long periods.  R. 140.[2]  He initially claimed that his disabling condition began

on April 9, 1997, id., but later amended the onset date to November 1, 1998, R. 27.  Blizzard's

application was denied initially and on reconsideration.  R. 80-82, 103-05.  Blizzard subsequently

requested a hearing before an administrative law judge ("ALJ").  R. 106-07.

An administrative hearing was held on November 15, 2000.  R. 24-45.  Blizzard was

represented at the hearing by his attorney.  R. 26.  In a decision issued February 7, 2001, the ALJ

found that Blizzard was not disabled within the meaning of the Social Security Act.  R. 80-91.

On February 22, 2002, the Appeals Council granted Blizzard's request for review and remanded

the case to the ALJ for reconsideration.  R. 92-95.

A second administrative hearing was held on July 11, 2002, which Blizzard attended,

again represented by an attorney.  R. 46-77.  Raymond Cestor, a vocational expert, also appeared

and testified at the hearing.  R. 48, 69-76.  Following the hearing, the ALJ again denied

---

[1] "R." refers to the page numbers of the administrative record, which is annexed to the
Answer, filed Apr. 30, 2004 (Docket #5).

[2] "Slipped capital femoral epiphysis" is a condition that occurs when the growing end of
the femur (thigh bone) slips from the top of the femur.  The American Medical Association
Encyclopedia of Medicine 444 (Charles B. Clayman ed., 1989).  "Chondrolysis" refers to the
disappearance of articular cartilage as the result of disintegration or dissolution of the cartilage
matrix and cells.  Stedman's Medical Dictionary 341 (27th ed. 2000) (hereinafter "Stedman's").

Blizzard's claims for benefits. R. 12-22. The decision became final when the Appeals Council denied Blizzard's request for review on November 5, 2003. R. 5-7.

Blizzard filed the instant action on December 31, 2003. See Complaint, filed Dec. 31, 2003 (Docket #1). The Commissioner has moved for judgment on the pleadings. See Motion for Judgment on the Pleadings, filed June 25, 2004 (Docket #7); Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed June 25, 2004 (Docket #8) ("Def. Mem."). Blizzard has cross-moved for judgment on the pleadings. See Plaintiff's Cross Motion for Judgment on the Pleadings, filed July 30, 2004 (Docket #11); Memorandum of Law in Support of Cross-Motion for Judgment on the Pleadings, filed July 30, 2004 (Docket #12) ("Pl. Mem."). The Commissioner has submitted a supplemental memorandum of law. See Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Further Support of the Commissioner's Motion for Judgment on the Pleadings, filed Aug. 20, 2004 (Docket #14).

B. Evidence Presented at the Initial Hearing Before the ALJ

1. Blizzard's Testimony

Blizzard was born on November 28, 1958. R. 33. He graduated high school and attended Bronx Community College for one year. Id. At the time of the initial hearing, Blizzard was living in an apartment with his girlfriend and her daughter. R. 32.

Blizzard has been treated for his bilateral slipped capital femoral epiphysis since early adolescence. See R. 28. In spite of his condition, Blizzard was able to work for many years, holding a position with the same telephone company from 1979 until 1998. R. 34. At the end of

his career with the phone company, Blizzard worked as a maintenance administrator – a job that involved using a computer to test phone lines – and had also worked answering repair calls. R. 34-35.  Blizzard left his position answering repair calls – a position that was primarily sedentary with the flexibility to sit or stand – because both sitting and standing placed too much pressure on his hips and "traveling was killing [him]."  R. 35.

As a result of the problems in his hips, Blizzard reported stiffness and pain when sitting or standing and was "constantly" lying down during the day.  R. 37-38.  Although Blizzard stated that "walking [was] not the problem," he could only walk a block or two at a time and occasionally used a cane.  R. 36-39.  He stated that he was no longer able to use public transportation because the seats on the buses were too hard.  R. 33. He could not sit continuously for more than an hour and a half or stand for more than an hour.  R. 39.  Blizzard testified on a typical day he would engage in very little activity, spending the majority of the day inside the apartment lying down and watching television, although he would occasionally "cook a little something" for his girlfriend's daughter.  R. 37-38.  Blizzard also reported that he was unable to bend at the hips and thus could not put on his socks or tie his shoes without assistance, and had some difficulty using the bathroom.  R. 38.

2. <u>Medical Reports, Progress Notes and Other Evidence</u>

a. <u>Dr. Richard Ulin</u>.  Blizzard has been under the care of Dr. Richard Ulin, an orthopedic surgeon, since he was 15 years old.  R. 164, 252.  Blizzard underwent several surgeries under Dr. Ulin's care, including an internal rotation osteotomy of the femur in 1975 and an operation to remove a bone plate in 1978.  R. 268.

Blizzard continued to see Dr. Ulin intermittently as he got older.  See generally R. 250-55, 294, 298-300, 302, 305-09 (medical records from Dr. Ulin).  Although Dr. Ulin did not physically examine Blizzard between 1996 and 2000, R. 291, he completed a Qualified Health Care Provider's Information form for Blizzard in 1996, diagnosing him with vein thrombosis, status post slipped capital femoral epiphysis, and chondrolysis, R. 283.  In January 1998, Dr. Ulin completed a Family Medical Leave Act Certification noting that Blizzard suffered from a chronic condition and his incapacity would last until an undetermined date.  R. 293.  He also wrote a letter in which he repeated his diagnosis from 1996, noted that X-rays of Blizzard's hips showed "early degenerative changes," and concluded that "Mr. Blizzard has a partial permanent disability."  R. 294.

Dr. Ulin physically examined Blizzard in November 2000 and completed a Lower Extremities Impairment Questionnaire on December 1, 2000.  R. 221-27.  Dr. Ulin diagnosed osteoarthritis in both hips and stated that Blizzard's prognosis was "[p]oor – will require hip replacement."[3]  R. 221.  Dr. Ulin's clinical findings were as follows: limited range of motion and tenderness in hips; limited range of motion in part of the spine; muscle atrophy in thighs; weakness in thighs, hip abductors, and quadriceps; slipped capital femoral epiphysis; and an abnormal gait.  R. 221-22.  X-rays confirmed severe osteoarthritis, particularly on the left side.  R. 222.  Dr. Ulin concluded that Blizzard's primary symptoms – pain, fatigue, and limited ability to walk and sit – were consistent with his physical impairments.  R. 223.  Dr. Ulin noted that

---

[3]"Osteoarthritis" is defined as "[a]rthritis characterized by erosion of articular cartilage . . . ; pain and loss of function result[s]."  Stedman's, at 1282.

Blizzard experienced pain on a daily basis in his groin and thigh brought on by weight-bearing activities, such as walking and lifting.  Id.  He indicated that Blizzard would soon require total hip replacement.  R. 225.  During an eight-hour day, Dr. Ulin estimated that Blizzard could sit for less than one hour, stand or walk for less than an hour, and should get up and move every one to two hours.  R. 224.  He also concluded that Blizzard should never lift or carry any weight, kneel, bend, or stoop, but noted no other limitations.  R. 224-27.  Dr. Ulin did, however, note that pain, fatigue or other symptoms would "frequently" be severe enough to interfere with Blizzard's attention and concentration and predicted that Blizzard would likely be absent from work more than three times a month.  R. 225-26.  Based on his examination, Dr. Ulin estimated that the earliest date that Blizzard's symptoms and limitations would have appeared was five to six years previously.  R. 227.

                                    b.  <u>Dr. Chang Yoo, Dr. James Stulman, and Dr. Deborah Kaplan</u>.  On May 9, 1996, Dr. Chang Yoo completed a Qualified Health Care Provider's Information form.  R. 287.  Dr. Yoo diagnosed Blizzard with deep vein thrombosis and suggested treatment with anticoagulants for three months "to prevent further progression and to prevent catastrophic event of pulmonary emboli."  Id.  On this form, Dr. Yoo did not mark Blizzard as being disabled or note any restrictions on his ability to work.  Id.

       Approximately one month later, Dr. James Stulman completed a Qualified Health Care Provider's Information form.  R. 232.  Dr. Stulman repeated Dr. Yoo's diagnosis of deep vein thrombosis, but concluded that Blizzard had been totally disabled since May 8, 1996.  Id.

On April 6, 1998, Dr. Deborah Kaplan wrote that Blizzard needed "to be placed on restricted hours from 10:00am - 2:00pm for the next three months."  R. 166.

                     c.  Mt. Sinai Medical Center.  Dr. Ulin referred Blizzard to Mount Sinai Medical Center ("Mount Sinai"), where Blizzard was first evaluated on February 17, 2000.  R. 197, 230.  Progress notes from June 15, 2000 report that Blizzard complained of severe bilateral hip pain, had bilateral hip flexion to 45 degrees and internal and external rotation of less than 20 degrees.  R. 229.  The notes reflect that total hip replacement was discussed, but that Blizzard did not want to pursue that option.  Id.

Blizzard returned to Mount Sinai to have a Multiple Impairments Questionnaire filled out for his counsel, a form that Dr. Erik Johnson completed on July 10, 2000.  R. 209-16.  Dr. Johnson diagnosed slipped capital femoral epiphysis and osteoarthritis in both hips.  R. 209.  His prognosis was "[p]oor."  Id.  He characterized Blizzard's pain as "[c]onstant" and moderately severe, and reported being unable to completely relieve the pain without unacceptable side effects.  R. 211.

Dr. Johnson also performed an analysis of Blizzard's functional capacity for work.  He estimated that Blizzard could sit for one hour a day, and stand or walk for one hour a day.  Id.  Dr. Johnson suggested that Blizzard would have to get up and move around every half hour and recommended that he take a break of a half hour before sitting again.  R. 212.  He calculated that Blizzard could lift up to twenty pounds frequently, but never carry any weight.  Id.  Dr. Johnson found no limitations with respect to other activities, including kneeling, bending, or stooping.  R.

215.  He suggested that the earliest date of onset of the symptoms and limitations he described was July 2000.  <u>Id.</u>

    3.  <u>Consultative Examinations</u>

      a.  <u>Dr. D. Karam</u>.  Dr. D. Karam, an orthopedist, conducted a disability examination of Blizzard on December 6, 1999.  R. 172-74.  He noted that Blizzard complained of "mild to severe, intermittent, aching pain at both hips."  R. 172.  The examination revealed full range of motion of the cervical spine, shoulders, elbows, wrists, fingers, knees and toes, and no pain or swelling in these areas.  R. 172-73.  Dr. Karam observed that Blizzard had a "mild stiff gait" but that he did not use any special equipment to walk.  R. 173.  Dr. Karam reported that Blizzard was able to get up on his toes and heels with "slight difficulty" and that he had "some difficulty" getting up from a chair and getting up from a table into a sitting position.  <u>Id.</u> Dr. Karam found that straight leg raising was limited due to Blizzard's hip problems, but noted no pain on motion or spasm in the lower back.  <u>Id.</u>  He noted right hip flexion of 60 degrees, normal extension, abduction of 35 degrees, and normal adduction.  <u>Id.</u>  External rotation was 35 degrees and internal rotation was zero.  <u>Id.</u>  On the left, hip flexion was 50 degrees, extension was normal, abduction was 35 degrees, and adduction was normal.  <u>Id.</u>  External rotation was 35 degrees and internal rotation was zero.  <u>Id.</u>  X-rays revealed moderate osteoarthritis of the left hip.  R. 174.  Dr. Karam reported "moderate pain at limits of motion of both hips with some tenderness" and indicated that Blizzard's prognosis was "fair."  R. 173-74.

    Dr. Karam diagnosed Blizzard with bilateral slipped femoral epiphysis and osteoarthritis in both hips.  <u>Id.</u>  Based on his clinical findings, he concluded that Blizzard's ability to do work-

related activities was "[l]imited by his hips in lifting or carrying heavy objects, pushing and pulling, long-distance ambulation, standing for a long time and sitting comfortably." R. 174.

                    b. <u>Dr. E. B. Balinberg</u>. Dr. Balinberg, an internist, evaluated Blizzard on April 4, 2002. R. 316-17. He diagnosed varicose veins in the left calf and noted Blizzard's history of phlebitis. R. 317. With respect to Blizzard's capacity to do work-related activities, Dr. Balinberg stated that Blizzard's primary problem was orthopedic and observed that "he has to avoid prolonged sitting or standing . . . [and] alternate positions." <u>Id.</u>

                    c. <u>Dr. Antero Sarreal</u>. Dr. Sarreal, an orthopedist, R. 18, also evaluated Blizzard on April 4, 2002. R. 322-24. Dr. Sarreal noted Blizzard's long history of bilateral hip pain and multiple hip operations. R. 322. At the examination, Blizzard reported "difficulty standing and sitting due to continuous bilateral hip pain," stiffness in his right knee, and "difficulty sitting more than 15 minutes." <u>Id.</u> Dr. Sarreal found that Blizzard's cervical spine was normal, but detected "bilateral side moderate lumbar paravertebral musculature tenderness" in his lumbar spine. R. 323. Supine straight leg raising caused discomfort and sitting strait leg raising was negative bilaterally. <u>Id.</u> Dr. Sarreal also found "diminished bilateral hip active range of motion" and pain at the end of movement. <u>Id.</u> He observed that Blizzard walked "slowly with a limping gait and shortened left lower extremity gait, left foot turned laterally on walking," but that Blizzard did not use an assistive device. <u>Id.</u> Dr. Sarreal observed that heel and toe standing was painful and that Blizzard had difficulty walking heel to toe. <u>Id.</u> Blizzard also had difficulty getting onto the examining table. <u>Id.</u>

Dr. Sarreal diagnosed Blizzard with "[b]ilateral multiple hip operations with atrophy of the left thigh and right leg musculature," noted a shorter left lower extremity, found low back pain with radiculopathy affecting both lower extremities, obesity, a varicose vein in the left leg, and a history of depression.[4]  R. 324.  He estimated Blizzard's functional capacity to do work-related activities as the following: "[M]oderate limitation in lifting and carrying heavy objects, pushing and pulling, prolonged standing, long distance ambulation. . . . [N]o limitation in manipulative use of both hands including grasping, releasing, handling and fingering objects. . . . [F]requent limitation in squatting, crouching, bending and climbing and occasional limitation in stooping and sitting." Id.[5]

C.  The ALJ's First Decision

On February 7, 2001, the ALJ issued his initial decision, which determined that Blizzard was not entitled to disability insurance benefits or SSI.  R. 83-91.  First, he concluded that Blizzard's osteoarthritis was not severe enough to constitute a listed impairment.  R. 85.  In assessing Blizzard's residual functional capacity, he determined that Blizzard's statements concerning his impairment were not credible in light of the evidence from Dr. Johnson and Blizzard's own testimony at the hearing.  R. 86.  He also found that Blizzard did not appear to need treatment between November 1998 and February 2000 because he did not seek it.  R. 87.  The ALJ did not accord Dr. Ulin's opinion controlling weight, finding that it was contradicted by

---

[4] "Radiculopathy" is a "[d]isorder of the spinal nerve roots."  Stedman's, at 1503.

[5]The record also contains reports from two state agency physicians, Dr. S. Imam and Dr. R. Baum, R. 78, 178-85; R. 79, 198-205, neither of which are referenced in the ALJ's final decision.

Blizzard's testimony and noting that Dr. Ulin had no records for Blizzard between 1996 and 2000.  Id.  He also noted that no treating physician restricted Blizzard's activities or advised him not to work, and no evidence showed that he could not work because of disabling symptoms rather than poor work product.  Id.

The ALJ gave controlling weight to the opinions of the state medical examiners who determined that Blizzard was capable of sedentary work activity.  R. 86.  He also found that Blizzard had residual functional capacity for sedentary work with a sit/stand option.  R. 87.  Thus, because Blizzard could continue to do his past relevant work as a maintenance administrator, he was found not to be disabled.  Id.

On review, the Appeals Council (the "Council") found that the ALJ did not adequately evaluate the medical opinion of Dr. Ulin.  R. 93.  Specifically, the ALJ did not explain how Dr. Ulin's opinion was contradicted by Blizzard's testimony or by the report of Dr. Johnson.  Id.  The Council further held that Blizzard's "description of his past relevant work is not consistent with a sedentary [position] with a sit/stand option" and that the ALJ's opinion did not "contain a function-by-function assessment of the claimant's ability to perform this work."  R. 93-94.

The Council remanded the case with orders for the ALJ to consider the treating source opinion and to explain the weight given to it.  R. 94.  It also ordered the ALJ to consider Blizzard's "maximum residual functional capacity and provide [an] appropriate rationale" for his findings.  Id.  The Council also stated that, if the ALJ found it necessary to proceed to the fifth step of the disability determination process, he must certify the sufficiency of the evidence to

support his finding of residual functional capacity.  Id.  Finally, the Council stated that the ALJ should obtain evidence from a vocational expert if warranted by the evidence presented.  Id.

D.  Rehearing Following Remand

1.  Blizzard's Testimony

A second hearing was held on July 11, 2002.  In response to the ALJ's questions about his past work experience, Blizzard again discussed his former position with the telephone company.  Blizzard testified that he was assigned his last job with the company – taking repair calls – because he was in too much pain to walk around as he had been required to do as a maintenance worker.  R. 52-53.  While answering repair calls, the telephone company allowed him to sit or stand as needed and Blizzard was able to keep his foot elevated when seated.  R. 70-71.  He testified that this job required him to walk half an hour to an hour a day, sit from six to eight hours a day, and lift no more than ten pounds.  R. 51.  Despite the accommodations, Blizzard developed phlebitis in his calf which caused a blood clot.  R. 53.  Finally, even the sedentary repair job became "too physically difficult" for Blizzard to continue working.  R. 54.

Blizzard testified that he felt pain "constantly, all the time," and that it increased whenever he was more active.  R. 61.  While Blizzard took his grandmother's Celebrex for the pain, he stated that it only helped on "mild" days.  Id.  Blizzard also stated that he did not do "a whole lot of anything" and spent most days lying down.  Id.  Blizzard noted that he could walk about a block, could not sit in a straight angle, and had a lot of pain while standing.  R. 61-64.  He said he could only sit two to three hours before he had to stretch out to relieve the pain.  R. 64-65.

### 2. Vocational Evidence

Raymond Cestor appeared as a vocational expert at the second hearing. R. 69-76. He testified that Blizzard's last position with the phone company, as performed, was a sedentary position. R. 71. Cestor opined that a person of Blizzard's age, education, and work experience, who was capable of performing a sedentary job with a sit/stand option and restricted ability to squat, crouch, bend, or climb, could perform Blizzard's last job. R. 72. He also stated that such a person could also work as a parking lot cashier, ticket seller, and surveillance system monitor, jobs widely available in the New York City region and nationally. R. 72-73.

### 3. The ALJ's Second Decision

Following the hearing, the ALJ issued a second decision denying Blizzard disability benefits. R. 12-22. In making this decision, the ALJ again concluded that Blizzard's statements concerning his impairments and their impact on his ability to work were not credible in light of his testimony at the hearing on November 15, 2000. R. 19. The ALJ noted that no treating source restricted Blizzard's activities or advised him not to work. R. 20. Although he found Blizzard's allegations concerning his symptoms credible, he saw no evidence that they were disabling. Id. He again refused to give controlling weight to Dr. Ulin's report on the grounds that Blizzard's testimony conflicted with the report, no evidence showed that Blizzard could not "lift or carry," and there was a gap in the treatment record. Id.

The ALJ stated that he gave great weight to the opinions of Dr. Balinberg and Dr. Sarreal because he found them to be supported by the physical examinations. Id. The ALJ determined

that the physical examinations supported only the conclusion that Blizzard should avoid prolonged sitting/standing and should alternate positions.  Id.

The ALJ concluded that Blizzard had a severe impairment, but that it did not meet or equal a listed impairment.  R. 21.  He next determined that Blizzard had the residual functional capacity to do limited sedentary work.  R. 22.  Based on these findings, he concluded that Blizzard retained the residual functional capacity to do his past relevant work, or, in the alternative, that other jobs existed in the national economy that Blizzard would be capable of performing.  R. 22.  Specifically, the ALJ's findings were as follows:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since November 1, 1998.

3.   The claimant's congenital hip problems/osteoarthritis, low back pain with radiculopathy, and varicose vein in his left leg are severe impairments, based on requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.   The claimant has the following residual functional capacity for sedentary work with a sit/stand option at the claimant's will with very limited ability to squat, crouch, bend or climb. [sic]

8.   The claimant's past relevant work as a maintenance administrator did not require the performance of work-related activities precluded by his

residual functional capacity (20 CFR §§ 404.1565 and 416.965).

9.      Alternatively, the vocational expert testified that a hypothetical individual of the claimant's age, with his education and work history, and the above residual functional capacity, could perform other work. As examples, the expert identified 3 sedentary level jobs: parking lot attendant, a ticker [sic] seller, and a surveillance systems monitor. The vocational expert testified that the exertional skill levels of the enumerated jobs are consistent with the D.O.T. SSR 00-4p.

10.     The claimant's medically determinable congenital hip problems/ osteoarthritis, low back pain with radiculopathy, and varicose veins in his left leg do not prevent the claimant from performing his past relevant work.

11.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(e) and 416.920(e)).

R. 21-22. The opinion of the ALJ became final when the Appeals Council denied review on

November 5, 2003. R. 5-8

II. APPLICABLE LEGAL PRINCIPLES

    A. Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must first determine whether the

Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir.

1999). If the Commissioner failed to apply the correct legal standard in making a determination,

the reviewing court must not defer to the Commissioner's decision. See Townley v. Heckler,

748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for

reversal.") (citation omitted). If the correct legal standard has been applied, however, the court

must determine whether the decision was supported by substantial evidence. Tejada, 167 F.3d at

773. "Substantial evidence" is "'more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

If the reviewing court finds substantial evidence to support the Commissioner's final

decision, that decision must be upheld, even where substantial evidence supporting the

claimant's position also exists. 42 U.S.C. § 405(g) ("The findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive . . . ."); Shaw v. Chater, 221

F.3d 126, 131 (2d Cir. 2000) ("A district court may set aside the Commissioner's determination

that a claimant is not disabled only if the factual findings are not supported by 'substantial

evidence' or if the decision is based on legal error.") (citations omitted). The role of the

reviewing court is therefore "quite limited and substantial deference is to be afforded the

Commissioner's decision." Burris v. Chater, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996).

B. Standard Governing Evaluation of Disability Claims by the ALJ

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person

will be found to be disabled only if it is determined that his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy." Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. <u>See</u> 20 C.F.R. § 404.1520(a)(4); <u>see also</u> <u>Curry v. Apfel</u>, 209 F.3d 117, 122 (2d Cir. 2000) (describing the five-step process). In evaluating the claim, the Commissioner must first determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe impairment," <u>id.</u> § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," <u>id.</u> § 416.920(c). If the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpt. P, App. 1, or is equivalent to one of the listed impairments, the claimant must be found disabled. <u>Id.</u> § 404.1520(a)(4)(iii). If the claimant's impairment is not listed or is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do work he or she has done in the past. <u>Id.</u> § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. <u>Id.</u> Finally, if the claimant is unable to perform past work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work. <u>Id.</u> § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed

disabled.  Id.  The claimant bears the burden of proof on all steps except the final one (that is, proving that there is other work the claimant can perform).  Curry, 209 F.3d at 122 (citations omitted).

III.  DISCUSSION

Blizzard argues that the ALJ failed to properly apply the treating physician rule, erred in evaluating his credibility, and incorrectly found that he did not meet or equal the criteria to be found disabled.  Pl. Mem. at 15-24.  Each of these arguments is explored in turn.

A.  Application of the Treating Physician Rule

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d)(2).  The regulations require that the ALJ provide "good reasons" for the weight accorded a treating physician's opinion.  20 C.F.R. § 404.1527(d)(2).  The "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).  Where the ALJ does not accord controlling weight to a treating physician's opinion, the ALJ must explicitly consider: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist."  Shaw, 221 F.3d at 134 (quoting Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)).

The ALJ asserted two reasons for refusing to accord the medical opinion of Blizzard's

treating physician, Dr. Ulin, controlling weight.  First, the ALJ stated that the "claimant's own testimony contradicted the physician's opinion."  R. 20.  Second, he attached great significance to the fact that Dr. Ulin had not seen Blizzard between 1996 and 2000.  Id.  We discuss each of these reasons and then turn to the ALJ's decision to give "great weight" to the opinions of Dr. Balinberg and Dr. Sarreal.  Id.

                1.  Reasons for Discounting Treating Physician's Opinion

The ALJ offers only one example in which he claims Blizzard's testimony allegedly contradicts Dr. Ulin's findings.  He notes that Dr. Ulin's report states that Blizzard could not "lift or carry," though he asserts that "[t]he claimant even testified that he could lift 20 pounds."  Id.  Further, the ALJ declared, "There is no reason why the claimant cannot lift or carry."  Id.

Of course, whether Blizzard could lift or carry is not of great moment in this case.  Rather, the critical issue is whether Blizzard's undisputedly "severe" impairment – consisting at a minimum of "congenital hip problems/osteoarthritis, low back pain with radiculopathy, and [a] varicose vein," R. 21, – causes Blizzard to suffer such pain when he sits or stands for a normal eight-hour work period that he lacks the capacity to do even sedentary work.  Even if we were to focus on the issue of lifting, however, Blizzard's testimony as to his ability to lift could not reasonably have permitted the ALJ to disregard the treating physician's opinion.  In responding to the ALJ's question regarding his ability to lift, Blizzard based his assumption that he could lift 20 pounds on the fact that he must push "200 pounds" – presumably his own body weight – "when I get up every time."  R. 63.  Of course, using one's arms to push from a sitting into a standing position is not the same kind of lifting that might be required on a job.

In addition, Dr. Ulin's statement that Blizzard could not lift or carry was also supported by the evidence in the record.  His conclusion was based on a clinical finding that Blizzard's pain was brought on by weight-bearing activity.  R. 223.  It was also substantially supported by the opinions of several other physicians who noted Blizzard's limited ability to lift, including Dr. Johnson, Dr. Karam, Dr. Imam, and Dr. Sarreal.  R. 174, 179, 212, 324.

Thus, the ALJ's conclusion that "[t]here is no reason why the claimant cannot lift or carry" is simply unsupported and constitutes the ALJ's substitution of his opinion for that of a medical expert.  See Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (ALJ should not have "set his own expertise against that of physicians who submitted opinions to him") (internal quotation and alterations in original omitted).  It certainly provides no justification for discounting Dr. Ulin's opinion.

The ALJ's second reason for not according Dr. Ulin's opinion controlling weight – the gap in the treating record – is similarly insufficient to disregard Dr. Ulin's diagnosis.  Even where a claimant has not been treated at all for a substantial period of time, a gap in treatment will not automatically negate a finding of disability.  See, e.g., Shaw, 221 F.3d at 133 (gap in treatment will not negate compelling evidence of disability in the record).  This is especially true where the reason for not seeking treatment is a lack of financial resources.  Id.  ("It would fly in the face of the plain purposes of the Social Security Act to deny claimant benefits because he is too poor to obtain additional treatment that had proved unhelpful.").  As Shaw notes, "[j]ust because plaintiff's disability went untreated does not mean he was not disabled."  Id.  It is undisputed that Blizzard received extensive treatment from Dr. Ulin beginning in 1974.  R. 249-

51.  Blizzard testified that he did not return to see Dr. Ulin between 1996 and 2000, not because he did not suffer an impairment, but because he could not afford to continue treatment.  See R. 59-60.  Thus, Blizzard's failure to seek treatment from Dr. Ulin during a period of four years cannot be taken to indicate the absence of a disability during this period and certainly does not justify disregarding Dr. Ulin's opinion.

        2.  Weight Given to Physicians' Opinions

        Dr. Ulin's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d)(2).  As noted, an ALJ must give "good reasons" for the particular weight accorded a treating physician's opinion.  Id.  The failure to give controlling weight to Dr. Ulin's opinion here is not supported by the ALJ's decision or the record.

        First, Dr. Ulin's opinion regarding Blizzard's limited capacity to sit, stand, and walk is supported by objective clinical evidence.  Dr. Ulin's review of X-rays done in 1996 revealed "evidence of old chondrolysis and early degenerative changes."  R. 294.  Later X-rays taken of Blizzard's hips in 2000 revealed severe osteoarthritis, particularly in the left hip.  R. 222.  His physical examination also revealed limited and painful range of motion and tenderness in hips, muscle atrophy and weakness, and an abnormal gait.  R. 221-22.

        The Commissioner does not contest this point, but rather focuses her argument on the conflict between Dr. Ulin's opinion and the evidence offered by other physicians, as well as on Blizzard's own testimony.  In fact, there is only very limited conflict.

First, Dr. Balinberg, a specialist in internal medicine, repeatedly referred to the need to consult an orthopedist in evaluating Blizzard's exertional limitations. R. 318-21. In his report on Blizzard's capacity to do work-related activity, Dr. Balinberg noted that lifting, carrying, and sitting are affected by his impairment, but offered no specific conclusions about the extent of the limitations. R. 318-19. Instead, he wrote "Please see ortho!" throughout the report. R. 318-20. Where a non-treating physician sees a claimant on only one occasion and notes that another physician is in a better position to assess the claimant's capabilities, the non-treating physician's opinion is entitled to little weight. See generally Pizzo v. Barnhart, 325 F. Supp. 2d 438, 451-52 (S.D.N.Y. 2004) (finding that the ALJ gave undue weight to the opinion of a consulting physician who examined claimant on one occasion, did not have the claimant's past medical records, and stated that the treating physician was in a better position to assess the claimant's residual functional capacity). Moreover, Dr. Balinberg says nothing about the critical issue in this case: whether Blizzard is capable of sitting (with breaks for standing) for an entire workday. Rather, he notes only that Blizzard has "restricted ability to sit and stand" and should alternate positions. R. 318-21.

Furthermore, neither Dr. Balinberg nor Dr. Sarreal offer detailed opinions concerning Blizzard's residual functional capacity. For example, Dr. Balinberg refers to Blizzard's "[f]unctional capacity to do work related activities," but never states specifically what functional capacity Blizzard retains. R. 317. Dr. Sarreal makes no specific statement regarding Blizzard's capacity to sit, referring only to an "occasional limitation" in his ability to sit, despite noting that Blizzard complained of being uncomfortable sitting for more than fifteen minutes. R. 322, 324.

22

Dr. Sarreal also finds that Blizzard has a "moderate limitation" with respect to "prolonged standing," but he does not explain this characterization either. R. 324. Insofar as Dr. Sarreal expresses any opinions with respect to Blizzard's residual functional capacity, these opinions are consistent with Blizzard's contentions regarding his inability to work.

"[U]se of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding . . . considerable and constant exposure to medical evidence, to make the necessary inference that [a claimant] can perform the exertional requirements of sedentary work." Curry, 209 F.3d at 123. Where a consulting physician is silent on a particular aspect of the claimant's ability to work, "the Commissioner [is] precluded from relying on the consultants' omissions as the primary evidence supporting its denial of benefits." Rosa v. Callahan, 168 F.3d 72, 81 (2d Cir. 1999) (citing Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)).

Neither Dr. Balinberg's nor Dr. Sarreal's report contains conclusions that are sufficiently detailed to support a determination that Blizzard had the residual functional capacity to perform sedentary work. In the case of Dr. Balinberg in particular, silence clearly was not a reflection of Dr. Balinberg's opinion that Blizzard had no functional impairments, but rather of Dr. Balinberg's lack of expertise in diagnosing impairments that are primarily orthopedic.

Finally, neither the opinions of Dr. Balinberg nor Dr. Sarreal are so inconsistent with the opinion of the treating physician as to merit the ALJ's disregard of the treating physician's opinion. In Aronis v. Barnhart, the district court held that the treating physicians' conclusion that the claimant was unable to perform even sedentary work was not "so inconsistent" with the

consultative physician's conclusion that the claimant was subject to only "mild exertional limitations" that the treating physicians' opinions should be wholly disregarded. 2003 WL 22953167, at *6 (S.D.N.Y. Dec. 15, 2003). The court stated: "Where the sole inconsistency cited by the ALJ does not go to the existence of exertional limitations, but rather to the degree of those limitations, the ALJ should not, without more, completely discount the opinions of the treating physicians." Id. at *6; see also Providence v. Barnhart, 2003 WL 22077445, at *8 (S.D.N.Y. Sept. 5, 2003) (finding that the ALJ erred in giving controlling weight to the consultative physician's opinion that the claimant only had mild depression where the treating physician diagnosed bipolar disorder).

The ALJ himself recognized that two consultative physicians concluded that Blizzard "must avoid prolonged sitting/standing and has to alternate positions." R. 20. But the ALJ gives no explanation as to why a person who "must avoid prolonged sitting/standing" is nonetheless able to do sedentary work.

As for Blizzard's own testimony, that too does not constitute substantial evidence that would justify the ALJ's decision to disregard Dr. Ulin's opinion. The Commissioner points to Dr. Ulin's statement that Blizzard's symptoms would have been disabling beginning in 1994 or 1995, and argues that this statement was contradicted by Blizzard's conceded ability to work until 1998. See Def. Mem. at 18-19. But Dr. Ulin stated only that the "earliest date" on which symptoms would have arisen was 1994 or 1995, not that they could not have arisen later. See R. 227. Moreover, Blizzard testified that for the last two years of his job he was unable to do repair work and had to be moved to another office where he would be allowed to alternate between

sitting and standing.  R. 34-35.  His testimony that he felt extreme pain in his hips and back and

that he needed to take days off is consistent with Dr. Ulin's finding that he was very limited in

his ability to work.  R. 59.  Moreover, Blizzard's testimony suggests that he was trying to get

disability retirement or workers compensation during this time, a fact that tends to support Dr.

Ulin's conclusion.  See id.  "[If] a disabled person gamely chooses to endure pain in order to

pursue important goals . . . it would be a shame to hold this endurance against him in determining

benefits unless his conduct truly showed that he is capable of working."  Balsamo, 142 F.3d at

81-82 (quoting Nelson v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989)).

 In sum, the record demonstrates that the ALJ improperly applied the treating physician

rule because Dr. Ulin's opinion that Blizzard could not sit or stand for more than two hours a day

was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and

[was] not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d).  As the

Second Circuit held in Johnson v. Bowen, 817 F.2d 983 (2d Cir. 1987), the misapplication of the

treating physician rule precludes a finding that substantial evidence exists to support the ALJ's

decision.  Id. at 986 ("Where there is a reasonable basis for doubt whether the ALJ applied

correct legal principles, application of the substantial evidence standard to uphold a finding of no

disability creates an unacceptable risk that a claimant will be deprived of the right to have her

disability determination made according to the correct legal principles.");  see also Medina v.

Barnhart, 2004 WL 487310, at *10 (S.D.N.Y. Mar. 11, 2004) ("The . . . failure in this case to

provide 'good reasons' for discounting the opinion of plaintiff's treating physician and to fully

develop the record preclude[s] the Court from concluding that the finding of no disability is supported by 'substantial evidence' and should be upheld.").

B. Evaluation of Blizzard's Credibility

Where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll, 705 F.2d at 643). Here, the ALJ provided no reasoned basis for discounting Blizzard's testimony. Instead, he gave a confusing array of reasons for his judgment regarding Blizzard's credibility. After reciting the regulatory standards regarding disability determinations, the ALJ found that "[t]he claimant's statements concerning his impairments and their impact on his ability to work are not credible in light of his testimony at the hearing on November 15, 2000." R. 19. The ALJ then recites various pieces of Blizzard's testimony regarding his ability to function, such as his inability to sit or stand for lengthy periods and his description of his daily activities. R. 19-20. But none of this testimony is internally inconsistent or, indeed, inconsistent with the records and diagnoses of Dr. Ulin and Dr. Johnson.

The ALJ stated that "[n]o treating source has restricted the claimant's activities or advised the claimant not to work." R. 20. But whether a treating source ordered a "restriction" on Blizzard's activities or "advised" him not to work is not a requirement of the disability determination. In any event, both Dr. Ulin and Dr. Johnson expressed their view that Blizzard is unable to sit or stand for more than an hour during the day. Indeed, later on in his opinion, the

ALJ specifically notes that the Commissioner's own consultative doctors – Dr. Balinberg and Dr. Sarreal – "revealed that . . . [Blizzard] must avoid prolonged sitting/standing." R. 20.

In contradiction of his own conclusions, the ALJ also states that Blizzard's "allegations concerning his symptoms are generally credible." Id. He qualifies this statement only with the assertion that "the evidence of record does not establish that they are disabling." Id. This qualification, however, is also left unexplained. Once the ALJ accepted that Blizzard had accurately reported his symptoms – including his inability to sit or stand for more than an hour or two until great pain overtakes him – then it is unclear why these symptoms would not be "disabling."

Social Security regulations require ALJs to "consider all [a claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). Of course, statements about pain and other symptoms must be supported by evidence of a medical impairment that could reasonably produce those symptoms. Id. ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged . . . ."). In the instant case, the ALJ himself concluded that Blizzard suffered from "severe" impairments consisting of "congenital hip problems/osteoarthritis, low back pain with radiculopathy, and varicose vein in his left leg." R. 21. The ALJ cited to no evidence whatsoever from any doctor concluding that these

conditions actually permitted Blizzard to nonetheless sit or stand for a full workday without experiencing disabling pain.

Finally, Blizzard's statements that he was unable to work because of his disability should be given substantial weight as he was an employee with a nineteen-year history with the telephone company, a job he testified that he enjoyed. R. 34, 58-59. "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983) (citing Singletary v. Sec'y of Health, Educ. and Welfare, 623 F.2d 217, 219 (2d Cir. 1980)).

The Commissioner suggests that if Blizzard did little but lie down and watch television, medical reports would reflect evidence of atrophy. Def. Mem. at 20. This argument was not relied upon by the ALJ and thus invites this Court to improperly make judgments involving medical expertise. See Shaw, 221 F.3d at 134 ("Neither the trial judge nor the ALJ is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion."). Indeed, the Second Circuit has specifically rejected an ALJ's reliance on lack of atrophy to indicate the absence of a disability on the ground that such reliance set the ALJ's "own expertise against that of physicians who submitted opinions to him." Balsamo, 142 F.3d at 81 (internal quotation and alterations in original omitted). In any event, both Dr. Ulin and Dr. Sarreal in fact reported atrophy in Blizzard's legs. R. 221, 324. Dr. Ulin diagnosed muscle atrophy in Blizzard's thighs in his examination of November 2000 and Dr. Sarreal's report specifically diagnoses "atrophy of the left thigh and right leg musculature." Id.

The Commissioner also argues that Blizzard only sought treatment intermittently from the time of the onset of his alleged disability – seeing Dr. Ulin once and going to Mount Sinai three times – which the Commissioner calls "hardly an intensive course of treatment, such as would be expected for a person as restricted, and in as much pain, as plaintiff alleged." Def. Mem. at 20. But under similar circumstances, the Second Circuit has held that where a claimant had been treated in the past but had not improved, it was not unreasonable to discontinue treatment for a three-year period, especially where the claimant testified that he could not afford it. Shaw, 221 F.3d at 133. Here, Blizzard had received regular treatment since the time he was fifteen years old. R. 164. The physicians he saw in 2000 indicated that he needed hip replacement, an indication that his condition was deteriorating, not improving. R. 221, 229. Furthermore, he also testified that financial concerns led him to stop receiving treatment. See R. 59-60.

In sum, substantial evidence does not exist to support the Commissioner's determination that Blizzard is not disabled.

C. Listed Impairments

The ALJ's decision suffers from an additional defect. It fails to explain why Blizzard does not meet or equal a listed impairment in 20 C.F.R. 404 Subpart P, Appendix 1.

Where a claimant has a severe impairment, but that impairment is not listed in 20 C.F.R. Part 404, Subpt. P, App. 1, the ALJ must determine whether it is equivalent to one of the listed impairments. 20 C.F.R. § 404.1520(a)(4)(iii). Both Blizzard and the Commissioner agree that the relevant listing for Blizzard's hip impairments is found in section 1.02, which applies to

29

"[m]ajor dysfunction of a joint(s) (due to any cause)."  Pl. Mem. at 15; <u>accord</u> Def. Mem. at 15.[6]

The section defines "major dysfunction of a joint" as follows:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpt. P, App. 1, § 1.02.

Blizzard's condition seemingly meets each of the various elements of 1.02: (1) "gross anatomical deformity" – Dr. Sarreal himself characterized Blizzard's condition as a "deformity due to capitol [sic] epiphysis," R. 322; (2) "chronic joint pain and stiffness with signs of limitation of motion"; (3) the "involvement of . . . hip"; and (4) a "resulting inability to ambulate effectively."  Following the initial hearing, the ALJ's decision stated in conclusory fashion that Blizzard's osteoarthritis does not "approach[] the severity required by section[] 1.02."  R. 85. There is no discussion whatsoever of why this is so.  The ALJ's second decision does not even refer to this issue.

The Commissioner argues that the record showed that Blizzard could ambulate without assistance.  Def. Mem. at 15.  For this, the Commissioner relies heavily on the testimony of the state physicians.  <u>Id.</u> at 15-16.  The Commissioner's argument is undercut, however, by the ALJ's

---

[6]As Blizzard does not dispute that he is not impaired under the categories of 1.03 or 1.04, <u>see</u> Pl. Mem. at 15, the applicability of these categories to his alleged impairment will not be discussed.

failure to properly consider Blizzard's testimony. Blizzard testified that he had difficulty walking more than one or two blocks and could not carry out routine daily activities. R. 37-39. Although Blizzard testified that he rarely used any assistive device to walk, he appears to be unable to "ambulate effectively," as defined by the regulations, because he was unable to take public transportation or walk more than a block.[7]

D. Summary

A remand for rehearing would be necessary if the sole issue in this case were whether Blizzard met or equaled the impairment listed in 20 C.F.R. 404 Subpart P, Appendix 1, § 1.02. However, no such determination is required given this Court's conclusion that there was no evidentiary support for the ALJ's characterization of Blizzard's residual functional capacity. Because the record reflects that Blizzard cannot do even sedentary work, Blizzard is necessarily disabled inasmuch as the Medical Vocational Guidelines do not contemplate the existence of

---

[7]Section 1.00(B)(2)(b) provides:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held device(s) that limits the functioning of both upper extremities. . . . To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. . . . [E]xamples of ineffective ambulation include, but are not limited to, the inability to . . . walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, [and] the inability to carry out routine ambulatory activities . . . ."

employment for anyone able to perform anything short of sedentary work.  See generally 20

C.F.R. Pt. 404, Subpt. P, App. 2, § 200.

Thus, the reversal is "based solely on the Secretary's failure to sustain his burden of

adducing evidence of the claimant's capability of [performing] gainful employment" and the

conclusion that "the Secretary's finding that the claimant can engage in 'sedentary' work is not

supported by substantial evidence."  Carroll, 705 F.2d at 644.  In such a situation, "no purpose

would be served by our remanding the case for rehearing unless the Secretary could offer

additional evidence."  Id.; accord Balsamo, 142 F.3d at 82.  Given that more than five years has

elapsed since Blizzard first applied for benefits and in keeping with Second Circuit case law, the

case is remanded for the calculation of benefits.  See id.[8]

Conclusion

The case is remanded to the Secretary for the calculation of benefits.

SO ORDERED.

Dated: April 25, 2005
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[8]The Secretary could still, within 60 days, move this Court to "reopen the record for the purpose
of introducing additional evidence" as long as the evidence meets "the requirements of § 405(g),
i.e. (1) that the evidence be (a) new and (b) material, and (2) that good cause be shown for [her]
failure to produce the evidence in earlier proceedings."  Carroll, 705 F.2d at 644 (citing Carter v.
Schweiker, 649 F.2d 937, 942-43 (2d Cir. 1981)); accord Curry, 209 F.3d at 124 n.4.

Copies mailed to:

Charles E. Binder
215 Park Avenue South, 6th Floor
New York, NY 10003

Susan D. Baird
Assistant United States Attorney
86 Chambers Street
New York, NY  10007

employment for anyone able to perform anything short of sedentary work. <u>See</u> <u>generally</u> 20

C.F.R. Pt. 404, Subpt. P, App. 2, § 200.

Thus, the reversal is "based solely on the Secretary's failure to sustain his burden of

adducing evidence of the claimant's capability of [performing] gainful employment" and the

conclusion that "the Secretary's finding that the claimant can engage in 'sedentary' work is not

supported by substantial evidence." <u>Carroll</u>, 705 F.2d at 644. In such a situation, "no purpose

would be served by our remanding the case for rehearing unless the Secretary could offer

additional evidence." <u>Id.</u>; <u>accord</u> <u>Balsamo</u>, 142 F.3d at 82. Given that more than five years has

elapsed since Blizzard first applied for benefits and in keeping with Second Circuit case law, the

case is remanded for the calculation of benefits. <u>See</u> <u>id.</u>[8]

Conclusion

The case is remanded to the Secretary for the calculation of benefits.

SO ORDERED.

Dated: April 25, 2005
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[8]The Secretary could still, within 60 days, move this Court to "reopen the record for the purpose of introducing additional evidence" as long as the evidence meets "the requirements of § 405(g), i.e. (1) that the evidence be (a) new and (b) material, and (2) that good cause be shown for [her] failure to produce the evidence in earlier proceedings." <u>Carroll</u>, 705 F.2d at 644 (citing <u>Carter v. Schweiker</u>, 649 F.2d 937, 942-43 (2d Cir. 1981)); <u>accord</u> <u>Curry</u>, 209 F.3d at 124 n.4.